**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| LORETTA BROWMAN, et al. | |
|       Plaintiff | Civil Action File No. |
| v. | 1:21-cv-00112 |
| KENDALL PATIENT RECOVERY U.S., LLC | |
|       Defendant | |

## MOTION TO DISMISS

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, defendant Kendall Patient Recovery U.S., LLC ("KPR") files its motion to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim.

### I.    Introduction

The core question in this litigation is whether Plaintiffs can hold KPR liable in tort for sterilizing medical products in accordance with state and federal regulations. The answer is no. As such, Plaintiffs' claims against KPR for negligence (count I), willful and wanton misconduct (count II), private nuisance (count III), and ultrahazardous activity/strict liability (count IV) should be dismissed under Rule 12(b)(1) and (6).

### II.    Statement of Facts and Pertinent Allegations

#### A.    Defendant KPR's operations.

KPR operates a medical device sterilization facility in Augusta, Georgia. (*See* DE 1 ¶ 1.) Plaintiffs allege that KPR has operated this facility since 1968, and their claims are based on conduct dating back to 1968. (*Id.* ¶ 14.) Public records demonstrate, however, that KPR was formed in Delaware on March 23, 2017, and first authorized to transact business in Georgia on

June 23, 2017. (KPR Certificate of Authority, Exhibit A.)[1] Plaintiffs do not allege any facts explaining how KPR could be liable for conduct and injuries predating its existence.

### B. Ethylene oxide ("EtO") sterilization is regulated by federal and state agencies and is one of the most common, effective methods of medical sterilization.

KPR, like many medical device sterilizers, uses EtO in a sterilization process used "on over 20 billion health care products every year in the United States." (DE 1 ¶ 13.) Multiple federal and state agencies regulate the use and emission of EtO in commercial processes, including the Food and Drug Administration ("FDA"), Occupational Safety and Health Administration ("OSHA"), U.S. Environmental Protection Agency ("EPA"), and the Georgia Department of Natural Resources, Environmental Protection Division ("GA EPD"). (*See e.g.*, *id.* ¶ 18, 23, 44.) About half of all sterile medical devices in the U.S. are sterilized with ethylene oxide, and "[f]or many medical devices, sterilization with ethylene oxide may be the only method that effectively sterilizes and does not damage the device during the sterilization process."[2] EtO sterilization is critical to the health care supply chain and the provision of safe medical treatment.

GA EPD has issued KPR a permit to emit EtO. (KPR Air Quality Permit, Exhibit B.)[3] KPR's permit allows emissions of EtO subject to certain limits and controls. *See* O.C.G.A. § 12-9-7; *see also* 40 C.F.R. § 36.360 *et seq.* (federal regulations applicable to EtO sterilizers); O.C.G.A. § 12-9-1, *et seq.* (Georgia Air Quality Act, establishing GA law regarding emissions of pollutants including EtO); Ga. Comp. R. & Regs. r. 391-3-1 (GA EPD regulations implementing authority

---

[1] The court may consider matters of public record and documents attached to or referenced in the complaint when ruling on a motion to dismiss. *See Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

[2] FDA, Ethylene Oxide Sterilization for Medical Devices (Sept. 24, 2020), available at https://www.fda.gov/medical-devices/general-hospital-devices-and-supplies/ethylene-oxide-sterilization-medical-devices (last accessed Aug. 26, 2021).

[3] Available at https://epd.georgia.gov/kpr-permits-and-permit-applications (last accessed Aug. 26, 2021).

under the federal regulations and the Georgia Air Quality Act). Plaintiffs do not allege that KPR violated the terms of its permit or any applicable EtO regulations.

### C.   Plaintiffs misleadingly allege that KPR violated limits on EtO emissions.

The Complaint attempts to allege some wrongdoing on KPR's part by insinuating that KPR violated the law by exceeding the "acceptable limit" and "Acceptable Ambient Concentration" for EtO emissions, without identifying any law or regulation creating such "acceptable" limits. (DE 1 ¶¶ 30, 44.) For example, Plaintiffs allege that, based on a 1986 assessment by the EPA, maximum EtO concentrations from the KPR facility in 1986 were "as high as…584 times the current acceptable limit." (*Id.* ¶ 30 (emphasis added).) Plaintiffs do not state what the purported "current acceptable limit" is or by what authority it was established.[4]

Similarly, Plaintiffs allege that "[a]ccording to the [GA EPD] air modeling, the KPR facility exceeds Georgia's annual Acceptable Ambient Concentration" ("AAC") for EtO. (*Id.* ¶ 44.) However, the AAC is not a regulatory limit on emissions. GA EPD uses the AAC in its "guidelines" when evaluating permit applications for new or modified sources of emissions. (*See* Guideline for Ambient Impact, etc., Exhibit E pp. ii, § 1.0.).[5] Thus, the AAC is not a regulatory "maximum allowable air concentration of toxic air pollutants (DE 1 ¶ 45); it is a "screening tool" used by the GA EPD in connection with its modeling of emissions at specific sites. (EPD Report,

---

[4] In fact, there is no regulation establishing a "current acceptable limit" of maximum EtO concentrations. Plaintiffs' "current acceptable limit" appears to be a reference to the National Air Toxics Assessment (NATA), since 11.68 µg/m$^3$ divided by 584 (DE 1 ¶ 30) equals 0.02 µg/m$^3$, which was the risk screening value used in the 2014 NATA. (*See* GA EPD KPR Modeling Memo ("EPD Report"), Exhibit C at 12). But the NATA is a "screening tool," which was released over 30 years after the EPA's 1986 assessment. (*See id.* ¶ 33; 2014 NATA Fact Sheet, Exhibit D at 3.) This "screening tool" cannot be characterized as the "current acceptable limit," much less the acceptable limit in 1986. NATA itself acknowledges that it should not be used "to pinpoint specific risk values within a census tract" and cautions "**DON'T** use NATA results…to quantify benefits of reduced air toxic emissions." (*Id.* (emphasis in original).)

[5]    Available    at:    https://epd.georgia.gov/air-protection-branch-technical-guidance-0/toxic-impact-assessment-guideline (last accessed Aug. 23, 2021).

Exhibit C at 1 ("GA EPD uses AACs as a screening tool.").) Although Plaintiffs incorrectly imply that GA EPD guidance establishes a regulatory limit on emissions, they do not actually identify any law or regulation that KPR allegedly violated.

### III. Argument and Citations of Authority

**A.** **This Court lacks subject matter jurisdiction over Plaintiffs' claims.**

    **1.** **Plaintiffs do not have standing because their injuries are not traceable to KPR's conduct.**

"[A]ny person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). To demonstrate standing, a plaintiff must prove (1) he has suffered a concrete injury that is (2) fairly traceable to the challenged conduct and (3) likely to be redressed by a favorable judicial decision. *Id.* The plaintiff bears the burden of establishing these elements, and at the pleading stage, the plaintiff must clearly allege facts demonstrating each element. *Spokeo, Inc. v. Robins*, 578 U.S. 856, 136 S.Ct. 1540, 1547 (2016). Here, Plaintiffs fail to allege sufficient facts to show that their alleged injuries are traceable to the challenged conduct.

"Article III requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). "[A] plaintiff lacks standing to challenge a rule if an independent source would have caused him to suffer the same injury." *Id.* at 1272 (quoting *Swann v. Secretary, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012)). Plaintiffs' Complaint does not plausibly show that their alleged injuries are attributable to EtO emissions at all, much less KPR's conduct. Instead, Plaintiffs rely on a speculative chain of

possibilities to reach the unsupported conclusion that their alleged injuries are actually traceable to KPR's conduct, rather than something else.

Plaintiffs allege that the census tract[6] where the KPR facility is located bears an increased risk of cancer due to KPR's EtO emissions and that they have suffered adverse health conditions as a result. (*See, e.g.*, DE 1 ¶¶ 48-137.) Plaintiffs cite studies that purportedly support these allegations (*id.* ¶¶ 33-34), but in reality, the studies contradict Plaintiffs' own allegations. Because the studies directly contradict allegations in the Complaint, those allegations[7] may not be accepted as true for the purpose of this motion. *See Bravo v. Loor-Tuarez*, 727 F. App'x 572, 576 (11th Cir. 2018) ("A plaintiff's alleged facts must be taken as true unless contradicted by exhibits."); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (district court may consider documents referenced in the complaint on a Rule 12 motion when they are a "necessary part of [the plaintiff's] effort to make out a claim").

Even assuming Plaintiffs' health conditions were caused by EtO, the studies Plaintiffs cite indicate that Plaintiffs' alleged exposure was highly unlikely to be from an industrial source at all, much less from medical sterilizers specifically. In fact, according to Plaintiffs' studies, most exposures to EtO are from <u>natural and "man-made"</u> sources. For example, the Agency for Toxic Substances and Disease Registry's December 2020 Draft Toxicological Profile for Ethylene Oxide ("2020 Toxicology Profile") (cited by Plaintiffs at DE 1 ¶ 23) states that <u>less than 1% of the industrial production of EtO is used as a fumigant and sterilizing agent</u>. (Excerpt of 2020

---

[6] Census tracts are "[l]and areas defined by the U.S. Census Bureau. Tracts usually contain from 1,200 to 8,000 people, with most having close to 4,000 people. Census tracts are usually smaller than 2 square miles in cities, but are much larger in rural areas." https://www.epa.gov/national-air-toxics-assessment/nata-glossary-terms#census-tract

[7] Specifically, the allegations suggesting that Plaintiffs were exposed to KPR's EtO emissions and that KPR's emissions caused their alleged injuries cannot be accepted as true. (*See, e.g.*, DE 1 ¶¶ 48-147.)

Toxicology Profile,[8] Exhibit F at 95.) Instead, most industrial uses of EtO are associated with chemical manufacturing, as well as petroleum refineries, pulp and paper, solvents, and waste disposal. (*Id.* at 102-103.) <u>Accordingly, 99% of industrial "emission" of EtO results from something other than medical sterilization</u>.

Furthermore, there are numerous non-industrial sources of EtO, which is generated naturally by microorganisms in wet soil, and by photochemical smog, primary and secondary tobacco smoke, fumigated food, flour, spices, skin care products, medical devices, wet soil, and combustion of hydrocarbon fuels, including "substantial" amounts from automobile exhaust. (*Id.* at 102, 103, 113, 114, 115.) An area map around KPR's facility evidences numerous other well-known "emitters" of EtO, including manufacturing, car rental, moving and trucking, highways, interstates, and an airport. (Area Map, Exhibit G.) Those facilities are, according to Plaintiffs' studies, far greater sources of EtO emissions than medical sterilization. The Complaint thus fails to show that Plaintiffs' alleged injuries can be plausibly traced to KPR's emissions, rather than any one or more of the thousands of other sources of Plaintiffs' EtO exposures not just in their immediate community, but anywhere that Plaintiffs have lived, worked, and visited.

Furthermore, even if KPR were the only source of Plaintiffs' alleged EtO exposure (and, as explained above, it could not be), the studies Plaintiffs rely on do not support their conclusion that KPR's emissions increased cancer risks at Plaintiffs' homes or workplaces. (*See* DE 1 ¶¶ 34-35.) Plaintiffs imply that KPR's emissions have broadly increased the risk of cancer in the vicinity of the facility. (*Id.* ¶ 34.) However, the 2014 NATA, on which Plaintiffs' conclusion depends, shows only that the tract <u>where the facility is located</u> has "potential cancer risks" of 64 per one

---

[8] The complete 2020 Toxicology Profile is available at <u>https://www.atsdr.cdc.gov/toxprofiles/tp137.pdf</u> (last accessed Sep. 7, 2021).

million. (2014 NATA Census Tract Data for Richmond County, Ga. ("NATA, Richmond County"), Exhibit H at 27.)[9] Plaintiffs do not allege that they live or work in the same census tract as the facility, so any increased risk of cancer <u>in that tract</u> does not suggest that Plaintiffs' injuries are traceable to KPR's emissions. Indeed, the 2014 NATA modeled several census tracts near the facility as having <u>no significantly increased cancer risks</u> related to EtO or other industrial point source emissions. (*Id.*)

Moreover, Plaintiffs do not allege any above average cancer risk resulting <u>from EtO</u>. (*See* DE 1 ¶¶ 34-35.) Instead, Plaintiffs carefully allege there is an elevated risk from "exposure to air toxics"—not EtO specifically—almost certainly because the NATA modeling they rely on states that the primary driver of cancer risks in the census tract where the facility is located is <u>formaldehyde</u>, <u>not EtO</u>. (NATA, Richmond County, Exhibit H at 28.) Therefore, the NATA modeling does not support Plaintiffs' conclusory allegations attributing their injuries to EtO.

In sum, Plaintiffs lack standing because they do not allege sufficient facts to show that their alleged injuries are fairly traceable to EtO at all, much less KPR's EtO emissions. Plaintiffs instead offer only speculation that (1) their injuries were caused by EtO and (2) any EtO that caused their injuries was emitted by KPR. The studies Plaintiffs rely on contradict those conclusory allegations and show that their alleged injuries not only could have been, but were statistically much more likely to have been, caused by an independent source or a third party, *e.g.*, formaldehyde or

---

[9] The 2014 NATA's modeled results for each census tract are in raw data files and an interactive map application, publicly accessible at <u>https://gispub.epa.gov/NATA/</u>. After navigating to a particular location (*e.g.*, Richmond County, Georgia), the data for that location can be exported into an excel spreadsheet, which identifies the modeled risk per million associated with each type of emission source and each chemical for each census tract. Exhibit H is the exported 2014 NATA data for Richmond County, Georgia, converted to a PDF format with the Tract ID code repeating on each page for ease of reference. The census tract in which the facility is located is highlighted for ease of reference (*see* DE 1 ¶ 33). The total risk (at 2), EtO risk (at 27), and formaldehyde risk (at 28) are each highlighted with a red box for reference.

numerous other sources of EtO. *See Cordoba*, 942 F.3d at 1271-72 (plaintiff lacks standing if his injuries were caused by third party or if an independent source would have caused him to suffer the same injury). Speculation does not satisfy the traceability requirement for Plaintiffs to have standing, and their claims must be dismissed under Rule 12(b)(1).

        2.      **The Workers' Compensation Board has exclusive jurisdiction over Alopecia Armstrong's claims.**

Alopecia Armstrong allegedly worked at KPR's facility from 1990 to 1997. (DE 1 ¶ 89.) There are no allegations that she otherwise lived or worked near the facility, and her claim is therefore work-related. The Workers' Compensation Act provides employees' exclusive remedies against employers for work-related injuries, "even if [they] arose from intentional misconduct on the part of the employer." *Kellogg Co. v. Pinkston*, 558 S.E.2d 423, 425 (Ga. Ct. App. 2001). Because Ms. Armstrong seeks redress for a "physical injury by accident due to occupational disease [caused by exposure to EtO] arising out of [her] employment, it is barred by the exclusivity provision of the Workers' Compensation Act." *Id.* (internal punctuation omitted) (quoting *Johnson v. Hames Contracting*, 431 S.E.2d 455 (Ga. Ct. App. 1993)). Accordingly, Ms. Armstrong's claims must be dismissed under Rule 12(b)(1).

**B.**      **The Complaint should be dismissed for failure to state a claim.**

To withstand a motion under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will result in dismissal. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

When ruling on a motion to dismiss, the Court may consider the allegations of the complaint, matters of public record, and documents attached to or referenced in the complaint. *Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (matters of public record); *Day*, 400 F.3d at 1276 (documents referenced in the complaint). Although there is substantial scientific debate regarding many of Plaintiffs' allegations, in this motion, KPR relies only on the allegations, the documents Plaintiffs cite in support of their allegations, and matters of public record to demonstrate that Plaintiffs failed to plead sufficient factual content to allow the Court to draw the reasonable inference that KPR is liable for Plaintiffs' alleged injuries. For the reasons discussed below, each of Plaintiffs claims must be dismissed for failure to state a claim.

1. **Plaintiffs' claims for injuries prior to August 3, 2019 are time-barred.**

Plaintiffs Browman (DE 1 ¶ 50), Evelyn Armstrong (¶ 54), Smith (¶ 58), DeWayne Williams (¶ 62), Snow (¶ 66), Lampkin (¶ 70), Betts (¶ 74), Holmes (¶ 78), Alopecia Armstrong (¶ 91), Bell (¶ 95), Wilkins (¶ 100), Annie Williams (¶ 104), Washington (¶ 108), Knight (¶ 112), Coleman (¶ 116), Watkins (¶ 128), Kelly (¶ 132), and Evans (¶ 136) each allege diagnoses or injuries occurring before 2019. Each of their claims is barred by the two-year statute of limitation for injuries to the person. O.C.G.A. § 9-3-33. Plaintiffs Lampkin (¶ 70), Taylor (¶ 83), Wilkins (¶ 100), and Pugh (¶ 124) allege injuries occurring during 2019. Because the statute of limitation continued to run until KPR was served with the Complaint on August 3, 2021, these claims are barred if they occurred before August 3, 2019. *See Aucoin v. Connell*, 209 F. App'x 891, 893 (11th Cir. 2006) (under Georgia law, if the statute of limitations expires between filing complaint and service, and service is not perfected within 5 days or diligently pursued, the commencement date does not relate back to the filing, and the statute of limitation bars the suit).

### a)     **The allegations do not support tolling.**

Each Plaintiff attempts to evade the statute of limitations by alleging that, at the time of diagnosis, the Plaintiff "did not have notice that [his/her] medical condition was wrongfully caused or that it was caused by the Defendant's emission of ethylene oxide." (*See, e.g.*, DE 1 ¶ 51.) Plaintiffs are presumably seeking to invoke Georgia's "discovery rule," which provides:

> [A] plaintiff's cause of action does not accrue, and the statute of limitations does not commence to run, <u>until he knew, or through the exercise of reasonable diligence should have discovered</u>, not only the nature (identity) of his injury but also the causal connection between the injury and the alleged negligent conduct of the defendant.

*Luem v. Johnson*, 574 S.E.2d 835, 837 (Ga. Ct. App. 2002) (emphasis added). The standard for applying the discovery rule is thus not whether Plaintiffs had passively received "notice" that their conditions were allegedly caused by EtO; instead, for the discovery rule to apply, Plaintiffs must allege when they knew of, and what reasonable diligence they exercised to discover, the purported causal connection between their injuries and EtO, and more specifically, KPR's EtO emissions. *See, e.g.*, *Klopfenstein v. Deutsche Bank Securities, Inc.*, 592 F. App'x 812, 815 (11th Cir. 2014) (affirming dismissal based on statute of limitations when plaintiff did not plausibly allege that he exercised reasonable diligence to discover his cause of action).

Here, the Complaint omits any alleged facts from which the Court could infer any Plaintiff exercised any diligence whatsoever. For example, Ms. Washington alleges her injury occurred in 1988, yet she fails to allege that she did anything in more than 30 years to discover the alleged cause of her injury. (DE 1, ¶ 108-109.) Any inference of diligence from those bare allegations is mere speculation. *See Twombly*, 550 U.S. at 555 (complaint must allege facts "to raise a right to relief above the speculative level"); *see also Womack v. Wilkes*, No. CV 119-104, 2019 WL 6340926 (S.D. Ga. Nov. 26, 2019) (refusing to toll statute of limitations at motion to dismiss stage because plaintiff did not provide information in his complaint or otherwise to show diligence).

Plaintiffs have the burden of showing the existence of facts that would toll the two-year statute of limitations. *Brown v. Lewis*, 361 F. App'x 51, 2010 WL 94596, at *4 (11th Cir. Jan. 12, 2010) (quoting *Falanga v. Kirschner & Venker, P.C.*, 648 S.E.2d 690 (Ga. Ct. App. 2007)). "[A]t the motion to dismiss stage, it is the plaintiff's burden to plead facts that establish that the statute of limitations has been tolled." *My 24Hour News.com, Inc. v. AT&T Corp.*, No. 1:18-CV-1647, 2019 WL 3521951, at *5 (N.D. Ga. Jan. 10, 2019) (dismissing claims when plaintiff alleged only that tolling had occurred, rejecting argument that plaintiff could establish tolling post-discovery); *see also Villarreal v. R.J Reynolds Tobacco Co.*, 839 F.3d 958, 973 (11th Cir. 2016) (en banc) (when plaintiff chose to anticipate a statute of limitations defense in his complaint, he bore the burden of alleging facts to support tolling). Plaintiffs failed to meet that burden, and their claims should be dismissed.

### b) <u>The statute of limitations was not tolled by a continuing nuisance</u>.

Plaintiffs also attempt to avoid the statute of limitations by asserting a nuisance claim. Under Georgia law, every continuance of a nuisance is a fresh nuisance for which a new action will lie. *Hoffman v. Atlanta Gas Light Co.*, 426 S.E.2d 387, 390 (Ga. Ct. App. 1992). However, a suit may only be maintained for damages that "accrued within the period of limitation prescribed by statute before the institution of the suit." *Gabbett v. City of Atlanta*, 73. S.E. 372, 373 (Ga. 1911); *see also Hoffman*, 426 S.E.2d at 390 (on a nuisance claim, plaintiffs could only recover for damage to their property occurring four years before initiating suit, based on four-year limitations period). Because the alleged injuries to the Plaintiffs identified above occurred more than two years before they filed suit, their claims are time-barred and should be dismissed.

### 2. <u>Plaintiffs fail to state a claim for negligence against KPR</u>.

Plaintiffs' negligence claim fails as a matter of law. To state a negligence claim under Georgia law, Plaintiffs must plead facts sufficient to show:

(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Heston v. Lilly*, 546 S.E.2d 816, 818 (Ga. Ct. App. 2001) (quoting *Lee St. Auto Sales, Inc. v. Warren*, 116 S.E.2d 243 (Ga. Ct. App. 1960)). Here, Plaintiffs failed to allege <u>any</u>, let alone plausible, facts establishing these elements. Instead, the Complaint merely recites the elements of a negligence claim. Under *Iqbal* and *Twombly*, this does not suffice. *See Arch Ins. Co. v. Clements, Purvis & Stewart, P.C.*, 850 F.Supp.2d 1371, 1373-74 (S.D. Ga. 2011), *aff'd*, 434 F. App'x 826 (11th Cir. 2011) (dismissing claim for alleging only threadbare and conclusory allegations).

### a)     <u>The Complaint does not identify any duty that KPR breached.</u>

"Before negligence can be predicated upon a given act, some duty to the individual complaining must be sought and found, the observance of which duty would have averted or avoided the injury or damage." *See City of Douglasville v. Queen*, 514 S.E.2d 195, 197 (Ga. 1999). Plaintiffs allege two potential grounds for finding that KPR owed a duty not to emit EtO: (1) regulatory limits on EtO emissions and (2) studies showing that environmental exposure to EtO emissions increases health care risks to the surrounding community.[10] But Plaintiffs' conclusory allegations that KPR owed a duty are contradicted by the documents on which Plaintiffs rely; accordingly, their negligence claims must be dismissed.

### (1)     <u>KPR did not violate any legal limit on EtO emissions.</u>

Plaintiffs allege that KPR violated its "duty to exercise reasonable care" by "[f]ailing to control and report fugitive emissions of EtO" and "[f]ailing to comply with Georgia's limits on

---

[10] As discussed in Section III.A.1, Plaintiffs rely on modeling that estimated increased cancer risks due to "air toxics," primarily formaldehyde, not EtO.

EtO concentrations." (DE 1 ¶¶ 139, 140.) The factual allegations in the Complaint do not support either of those conclusory allegations of a breach of duty.

First, the Complaint does not allege any facts showing that KPR "failed to control or report fugitive emissions." (*Id.* ¶ 140c.) Plaintiffs do not identify any control or reporting requirements that exist for such emission, much less with which KPR failed to comply. To the contrary, Plaintiffs admit that KPR reported its emissions on a yearly basis (*id.* ¶ 39), and that the reported emissions were not only controlled, but steadily declined year after year. (*Id.* ¶ 40.)

Second, as discussed in Section II.C., *supra*, while Plaintiffs allege that KPR violated the law by exceeding "acceptable limits" on EtO emissions (*id.* ¶¶ 30, 44), they do not identify any legal limits that KPR exceeded at any time. With respect to their allegation that KPR's emissions were more than "584 times the current acceptable limit," Plaintiffs do not state what the purported "current acceptable limit" is or by what authority, if any, it was established. With respect the allegation that KPR "exceed Georgia's annual Acceptable Ambient Concentration" ("AAC"), Plaintiffs omit that the AAC is not a regulatory limit on EtO emissions, but only part of a guidance document used by the GA EPD in evaluating permit applications.

The Complaint does not identify any federal or state legal restriction on EtO emissions even allegedly violated by KPR, and Plaintiffs' unsupported conclusions about what those standards should be, and improper deductions of fact about KPR's compliance with such non-existent standards, are not properly accepted as true for purposes of this motion. *See Henry v. Jones*, 484 F. App'x 290, 291 (11th Cir. 2012) (per curiam) (on a Rule 12(b)(6) motion, the court does not accept as true "unwarranted deductions of fact" or legal conclusions). Plaintiffs' negligence claims must be dismissed to the extent they are based on any purported lack of compliance with state or federal law, because the Complaint fails entirely to identify any such law.

**(2)** **Even assuming EtO caused Plaintiffs' injuries, such harm was not foreseeable based on contemporary information, and KPR did not have a duty to protect against an unforeseeable harm.**

Plaintiffs attempt to establish that KPR owed Plaintiffs "a duty to exercise reasonable care in the operation of its facility" by citation to various studies, reports, models, and administrative tools (collectively, "studies") that Plaintiffs suggest show that EtO exposure is a known danger. (*See* DE 1 ¶¶ 30, 33, 37-38.) Based on those studies, Plaintiffs allege that KPR breached its duty by "[e]mitting dangerous volumes of EtO into the air from its facility;" "[d]isregarding safe methods to adequately control EtO emissions from its facility;" "[f]ailing to warn or advise those who live or work in the community that they were being exposed to EtO;" and "[s]ubjecting those who live and work nearby its facility to an elevated cancer risk." (*Id.* ¶ 140.) Plaintiffs' reliance on these studies to impute a legal duty to KPR is misplaced. Even assuming EtO caused Plaintiffs' injuries, Plaintiffs' studies do not establish that such alleged harm was foreseeable. KPR did not have a duty to protect against an unforeseeable harm.

"Duty cannot be divorced from foreseeability." *Love v. Morehouse Coll., Inc.*, 652 S.E.2d 624, 626 (Ga. Ct. App. 2007). It follows that, to establish a breach of the applicable standard of conduct to support a negligence action, the alleged act or omission must have created a <u>foreseeable</u> unreasonable risk of harm. *Watson v. Gen. Mechanical Svcs.*, 623 S.E.2d 679, 681 (Ga. Ct. App. 2005). "[O]ne is not bound to anticipate or foresee and provide against what is unlikely, remote, slightly probable, or slightly possible." *Amos*, 529 S.E.2d at 422. As discussed more thoroughly below, the studies Plaintiffs rely on do not support an inference that KPR should have foreseen an unreasonable risk of harm to Plaintiffs because (a) contemporary studies did not identify risks associated with environmental exposure to EtO, (b) current studies cannot establish retroactive foreseeability, and (c) even current studies do not show that Plaintiffs' alleged injuries were foreseeable. Therefore, the Complaint does not plausibly allege that KPR owed a duty to Plaintiffs

because Plaintiffs do not identify a foreseeable risk of harm. *See Barnes v. St. Stephen's Missionary Baptist Church*, 580 S.E.2d 587, 590 (Ga. Ct. App. 2003) ("Whether a duty exists upon which liability can be based is a question of law.").

### (a) Contemporary science did not suggest there was a foreseeable risk of harm to Plaintiffs.

The Complaint does not explain how KPR could have foreseen any harm to Plaintiffs—individuals living and working near the facility—based on studies addressing occupational exposure[11] before EtO was even identified as a potential hazardous air pollutant under the Clean Air Act (i.e., 1968 through 1986).[12] (*See* DE 1 ¶ 11.) The EPA first published emission standards for sterilization facilities in 1994. *See* 40 C.F.R. Part 63, Subpart O. The EPA reassessed these standards in 2006 and determined they were sufficient; accordingly, the 1994 standards continue to govern the emissions restrictions in KPR's current state air permit. *See* Ethylene Oxide Emissions Standards for Sterilization Facilities, 71 Fed. Reg. 17712, 17713 (Apr. 7, 2006). Given EPA's express finding that both cancer and noncancer EtO risks associated with these existing federal standards were "acceptable" and "below their respective relevant health thresholds," as a matter of law KPR could not be found to have reasonably foreseen risks not anticipated by the authorities that were conducting studies and setting legal limits on emissions. *Id*. The Complaint

---

[11] For example, the 1977 NIOSH study (DE 1 ¶ 17) determined that OSHA's Permissible Exposure Limit ("PEL") of 50 parts per million ("ppm") limit was protective of long-term occupational exposures based on then-existing studies. (Excerpt of 1977 NIOSH Study, Exhibit I at vi (available in full at https://www.cdc.gov/niosh/docs/77-200/default.html (last visited Sep. 7, 2021)).) The 1981 NIOSH study (DE 1 ¶ 18) recommended that the occupational PEL be lowered (Excerpt of 1981 NISOH Study, Exhibit J at 9-10 (available in full at https://www.cdc.gov/niosh/docs/81-130/default.html (last visited Sep. 7, 2021)).) On June 22, 1984, OSHA published a 1 ppm PEL standard for EtO. *See* 29 CFR 1910.1047.

[12] All of the studies prior to that time were limited to high occupational exposures; none of them provided notice of a risk to residents who did not have occupational exposure to EtO. (*See, e.g.*, *id.* ¶ 20 (referencing a 1981 report on the dangers of EtO emissions to "workers and customers," not area residents); ¶ 22 (refencing 1990s study regarding employee exposure to EtO).)

does not allege any basis from which the Court could infer that KPR reasonably foresaw a risk of harm to individuals living and working around its facility when there were no studies suggesting it, and federal emissions standards expressly authorized KPR's sterilization activities.

**(b)** **Current studies do not establish retroactive foreseeability.**

Foreseeability is determined based on what the defendant knew or could have foreseen <u>at the time</u> of the alleged negligence. *See Smith v. Finch*, 681 S.E.2d 147, 149-50 (Ga. 2009) ("It is well recognized that 'an after-the-fact assessment of facts or evidence cannot be the basis of a negligence claim 'so long as the initial assessment was made in accordance with the reasonable standard of medical care.'"); *Bieling v. Battle*, 434 S.E.2d 719, 722 (Ga. App. 1993) (in 1982, AIDS was not a foreseeable risk associated with blood transfusion, and physicians could not be held liable for patient's injury). It cannot be based on future studies that obviously did not exist when the activity was commenced (as authorized by law). (*See* DE 1 ¶¶ 23, 25, 33, 36, 45.) Therefore, Plaintiffs' reliance on studies from 2016, 2018, and 2019 is misplaced. Most of the Plaintiffs' alleged EtO exposures and injuries were complete before 2016. Thus the 2016 IRIS, the 2014 NATA (published in 2018), and GA EPD's modeling of the facility in 2019 are not plausible bases from which KPR could have foreseen Plaintiffs' purported injuries. (*See id.*)

**(c)** **None of the studies cited by Plaintiffs shows a foreseeable risk of unreasonable harm to Plaintiffs.**

Regardless of when they were created, <u>none</u> of the studies cited by Plaintiffs supports the notion that KPR should have foreseen that its compliance with applicable EtO emissions regulations posed an unreasonable risk of harm to Plaintiffs. The 2016 IRIS, for example, offers no guidance regarding what an acceptable risk level for EtO is; it simply identifies the upper bound of cancer risk that <u>might</u> be associated with <u>continuous exposure</u> to a set concentration of EtO.

(Excerpt of 2016 IRIS,[13] Exhibit K at 2-1 (the IRIS analysis sought to derive an inhalation unit risk for EtO, *i.e.*, a plausible upper bound on the estimate of risk per µg/m$^3$ air breathed).) From there, the 2016 IRIS estimated what continuous exposure level might associated with a "cancer risk of 10$^{-6}$," *i.e.*, <u>a one-in-a million risk</u>. (*Id.* at 1-4.) A one-in-a-million risk is the very definition of "unlikely, remote, slightly probable," *i.e.*, not foreseeable. *See Catalano v. GWD Management Corp.*, No. CV 403-167, 2005 WL 5519861 (S.D. Ga. Mar. 30, 2005) (as a matter of law, owner of McDonalds restaurants was under no duty to train its employees on how to react to strip search scam targeting McDonalds restaurants; risk was not foreseeable as incidence of the scam was extremely rare: 14 incidents and over 13,000 McDonald's restaurants in the U.S.); *Med. Ctr. Hosp. Auth. v. Cavender*, 771 S.E.2d 153, 159 (Ga. Ct. App. 2015) ("Foreseeable consequences are 'those which, *because they happen so frequently*, may be expected to happen again.'"). In short, the 2016 IRIS did not forecast anything useful regarding foreseeable risks of EtO exposures, much less from sterilization activities alone.

Likewise, the 2014 NATA uses a similar "100-in-1 million risk level to help the Agency determine whether facilities need to reduce emissions." (NATA Fact Sheet, Exhibit D at 2.) Using this standard, the EPA concluded that the census tract in which KPR's facility is located was well below the 100-in-a-million risk screening threshold.[14] EPA also used the 100-in-a-million threshold in 2020 when it revised federal emission standards, concluding that a regulatory standard expected to result in exposures higher than a hundred times the IRIS "will achieve acceptable

---

[13] *See* https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf (last accessed Sep. 7, 2021) for complete copy of the 2016 IRIS.

[14] *See* Exhibit H at 2, finding a 63-in-a-million risk for all air toxics combined in the facility's census tract, with formaldehyde being the primary risk driver (*id.* at 28).

risks…and provide an ample margin of safety to protect human health." National Emission Standards for Hazardous Air Pollutants, 85 Fed. Reg. 49084, 49087 (Aug. 12, 2020).

Nor did the GA EPD modeling in 2019 provide any basis from which KPR could plausibly foresee that its facility's compliant emissions level allegedly imposed unreasonable risks. The Complaint quotes the very highest annual concentration expected near the facility fence line, but fails to allege a critical fact—whether any Plaintiff was even subject to that level of exposure. (DE 1 ¶ 46.) Indeed, the EPD report states that, at the closest residence, the highest annual average concentration was only 4.9 times the AAC (*i.e.*, taking plaintiff's allegations[15] as true, a 4.9 in a million chance of cancer at the very closest possible point of residence). (EPD Report, Exhibit C at 4 (Table 2).) For all other residences, the EPD's report predicted exposures to drop off below even a one in a million risk by 2.5 miles from the facility. (*Id.*)

In short, the Complaint does not identify a <u>single</u> law or regulatory standard that KPR violated; and when Plaintiffs' cited studies are reviewed carefully, and in full, they provide no plausible basis from which KPR could reasonably believe, much less foresee, that its compliance with the explicit regulatory standards imposed on it by the State of Georgia would cause injury to any of the Plaintiffs. *See Feldman v. Whipkey's Drug Shop*, 174 S.E.2d 474, 475 (Ga. Ct. App. 1970) ("One is bound to anticipate and provide against what usually happens and what is likely to happen, but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what is only remotely and slightly probable.");

---

[15] Plaintiff alleges that the annual AAC for EtO is 0.00033 µg/m³. (DE 1 ¶ 44.) Plaintiff further alleges that the annual concentration "around the facility" is "over 187 times the AAC." (*Id.* ¶ 45.) However, the annual concentration around the facility is irrelevant because Plaintiff does not allege that the decedent lived at the facility. Instead, the decedent lived and attended school between 5 and 6.1 miles away from the facility. (*Id.* ¶ 47.) The EPD Report (Exhibit C) shows at Table 2 (p. 4) that annual concentrations at the closest residences (R1) are only 4.9 times the AAC (far left column), not 187 times as Plaintiff implies.

*see also Johnson v. Avis Rent A Car System, LLC*, 858 S.E.2d 23, 29 (Ga. 2021) ("The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons…, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery."). Plaintiffs' Complaint should be dismissed as a matter of law.

### b)  KPR had no duty to warn Plaintiffs.

Plaintiffs assert that KPR was negligent based on an alleged "fail[ure] to warn or advise those who live or work in the community that they were being exposed to EtO." (DE 1 ¶ 144e.) Because KPR could not have plausibly (or reasonably) foreseen risks to Plaintiffs, KPR had no duty to warn them of risk of harm. Nor is there a general duty to "warn or advise" under Georgia law. The only recognized duty KPR would have to warn anyone of a "hidden danger or defect" would be as an owner or occupier of land with a duty to "either keep the premises safe from or warn of hidden dangers or defects." *Ga. Farmers' Mkt. Auth. V. Dabs*, 256 S.E.2d 613, 615 (Ga. Ct. App. 1979); *see* O.C.G.A. § 51-3-1. But any such duty would extend only to the premises and approaches to KPR's facility and only to invitees. *See Barnes* 580 S.E.2d at 590 (landowner owed no duty to passerby). Because Plaintiffs do not claim to be invitees, KPR did not have a duty to warn Plaintiffs of the conditions of its property. Further, there are no allegations regarding what warning or advice would have prevented the alleged injuries. Because Plaintiffs do not plead any recognized or plausible basis for an alleged duty to warn, their negligence claims fail to the extent they are based on a breach of this nonexistent duty.

### c)  Plaintiffs fail to plausibly allege proximate cause.

"[N]egligence is not actionable unless it is the proximate cause of the injury. A wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience." *Dowdell v. Wilhelm*, 699 S.E.2d 30, 32 (Ga. Ct. App. 2010) (emphasis added). Furthermore, the

plaintiff must allege not only general causation, *i.e.*, "whether a substance is capable of causing a particular injury or condition in the general population," but also specific causation, *i.e.*, "whether a substance caused a particular individual's injury." *Butler v. Union Carbide Corp.*, 712 S.E.2d 537, 540–41 (Ga. App. 2011) (citation omitted). Thus, conclusory allegations of a causal link between a type of exposure and cancer are insufficient if they do not explain how exposure caused the specific injury. *Motorola, Inc. v. Ward*, 478 S.E.2d 465, 466 (Ga. Ct. App. 1996) (defendant was entitled to summary judgment when plaintiff's expert only explained one mechanism by which electromagnetic fields could cause cancer, without any explanation to support a conclusion that it did cause the plaintiff's cancer); *see also Lemley v. Red Bull N. Am., Inc.*, No. 4:16-CV-080, 2016 WL 7197442, at *2 (S.D. Ga. Dec. 9, 2016) ("The complaint fails to advance proximate causation from mere possibility to plausibility because it does not allege how much Red Bull [the plaintiff] consumed, or when he did so in relation to his death. This shortcoming triggers dismissal.").

As explained in Section III.A.1, *supra*, the Complaint fails to allege how the specific injuries are causally linked to KPR's EtO emissions. Among other defects, the Complaint fails to plausibly allege that (i) the alleged injuries are caused by EtO as opposed to another carcinogen, *e.g.*, formaldehyde; (ii) Plaintiffs reside in an area meaningfully affected by the KPR facility's emissions; (iii) the facility meaningfully increased EtO exposures above natural variability in EtO exposures; (iv) Plaintiffs' EtO exposures exceeded an exposure threshold applicable to the durational exposures actually alleged by Plaintiffs; or (v) Plaintiffs' alleged injuries could plausibly be traced to EtO emissions from KPR's facility as opposed to exposure to the vast number of other EtO sources that are prevalent in Plaintiffs' communities and elsewhere. Each of those omissions is, standing alone, fatal to the Complaint.

As acknowledged in the studies Plaintiffs cite, there are different risk thresholds based on different durations of exposure to EtO. For instance, the NIOSH studies established thresholds for use when assessing exposures that occur for a limited amount of time (e.g., up to 8 hours per day), whereas the IRIS and AAC set lower exposure thresholds for individuals exposed 24/7, 365, for 70 continuous years. (*See* NATA Fact Sheet, Exhibit D at 2 ("A risk level of 100 in 1 million refers to the likelihood that 100 in 1 million (1 in 10,000) people would develop cancer if they breathe air containing the same amount of the same air toxic for 70 years.").)

Taking the sources Plaintiffs rely on as true, at most, Plaintiffs have alleged that continuous 24/7 exposure for a lifetime (70 years) to certain amounts of EtO can create some small cancer risk, and that exposure to larger concentrations of EtO in an occupational setting may be associated with a higher cancer or miscarriage rate. But none of the Plaintiffs allege that they experienced either of these types of exposures. And Plaintiffs fail to allege facts that show, or even support an inference, that brief or indirect exposures to EtO are associated with any level of cancer risk at all, let alone one large enough to be probable rather than simply possible. (*See, e.g.*, DE 1 ¶ 35 (purportedly providing an unsourced quote that the EPA "consider any exposure, however small, to a carcinogen to create some cancer risk").

Such slight risks, if indeed there are any, do not satisfy the obligation to plead facts showing that an injury is a probable, rather than merely possible, result of the defendant's conduct. Whatever the line between possibility and probability, a one in a million, or even one in ten thousand, chance is far from enough. *See e.g., Butler v. Union Carbide Corp.*, 712 S.E.2d 537, 540–41 (Ga. Ct. App. 2011) (upholding dismissal for lack of specific causation, where the defendant's contribution was one percent or less of the total amount of allegedly asbestos containing compound to which plaintiff was exposed, and that even if plaintiff's evidence were

credited, the alleged exposure was for days rather than the weeks that the plaintiff expert testified it would require to exceed relevant exposure thresholds). Because Plaintiffs have not plausibly alleged that KPR's EtO emissions were the proximate cause of their injuries, Plaintiffs failed to state a claim for negligence.

### 3. **Plaintiffs' duplicative allegations fail to state a claim for "willful and wanton misconduct."**

Plaintiffs repeat their negligence allegations, asserting that they also establish claims for "willful and wanton" misconduct. (DE 1 ¶¶ 142-144.) These allegations fail for the same reasons the negligence claims. (*See* Section III.B.2, *supra*.)

It is not enough to simply relabel Plaintiffs' negligence allegations as "willful and wanton." (Compare DE 1 ¶ 140 with ¶ 144.) *McNeal Loftis, Inc. v. Helmey*, 462 S.E.2d 789, 790 (Ga. Ct. App. 1995) ("A demonstration of mere negligence is not sufficient to show willful or wanton behavior."). "There is an element of intent, actual or imputed, in 'wilful and wanton conduct' which removes such conduct from the range of conduct which may be termed negligent." *Truelove v. Wilson*, 285 S.E.2d 556, 559 (Ga. Ct. App. 1981). Indeed, to allege willful and wanton conduct, "a plaintiff must demonstrate that a defendant's acts were 'such as to evidence a willful intention to inflict the injury, or else were so reckless or so charged with indifference to the consequences as to justify finding a wantonness equivalent in spirit to actual intent.'" *McNeal Loftis*, 462 S.E.2d at 790 (citing *Hawes v. Central of Ga. R. Co.*, 162 S.E.2d 14 (Ga. Ct. App. 1968)).

Plaintiffs have not pled facts necessary to meet this demanding standard, nor could they. Plaintiffs' claims are premised on KPR's use of EtO, which was specifically permitted by law. Plaintiffs contend that KPR "knew of the regulatory regime" (whatever that is), but do not allege that KPR actually violated the purported "regulatory regime." (*Id.* ¶ 145.) But because KPR had

the legal, EPD-permitted right to engage in its business, "[t]here can be no liability for the exercise of an absolute right." *Williams v. S. Cent. Farm Credit, ACA*, 452 S.E.2d 148, 151 (Ga. App. 1994).

Moreover, the Complaint does not establish that KPR had knowledge of any risk to Plaintiffs. Accordingly, the Complaint does not provide a factual basis to infer that KPR's lawful, EPD-permitted use of EtO evinced a "willful intention to inflict injury" or "indifference to the consequences as to justify finding a wantonness equivalent in spirit to actual intent." *McNeal Loftis*, 462 S.E.2d at 790. In sum, Count II must be dismissed because Plaintiffs' allegations fail to state any kind of claim for willful or wanton behavior.

### 4.    __Plaintiffs fail to state a claim for private nuisance__.

Plaintiffs claim they are entitled to injunctive and declaratory relief, as well as damages, for a "private nuisance." However, a nuisance claim cannot be predicated on an act authorized by and performed in accordance with the law. "That which the law authorizes to be done, if done as the law authorizes, cannot be a nuisance. Thus, where the act is lawful in itself, it becomes a nuisance only when conducted in an illegal manner to the hurt, inconvenience, or damage of another." *Queen*, 514 S.E.2d at 199 (quoting *Mayor & C. of Savannah v. Palmerio*, 249 S.E.2d 224 (Ga. 1978)). Given the absence of any allegation that KPR violated its permit, *i.e.*, its legal authorization for EtO emissions, the nuisance claim must fail.

To be sure, the Complaint is replete with allegations insinuating that KPR's EtO emissions are morally outrageous. (*See, e.g.*, DE 1 ¶ 36 (cancer risks around KPR's facility are "shockingly high"); ¶ 151 (emissions have "a toxic, poisonous, and deleterious effect").) And Plaintiffs falsely imply that agency actions and studies created legal standards that KPR violated. (*See* Section III.B.2(a), *supra*.) Nevertheless, Plaintiffs rightly stop short of identifying any actual statute, regulation, emissions permit, or other legal standard violated by KPR. KPR's lawful activity can

only be a nuisance if it is performed in an unlawful manner, which the Complaint does not allege. Therefore, Plaintiffs fail to state a claim for nuisance.

**5.** **KPR is not liable to Plaintiffs under a theory of "ultrahazardous activity/strict liability."**

Plaintiffs' final claim for strict liability is equally unavailing. At the outset, Plaintiffs' reliance on the ultrahazardous activity rule of strict liability is fatally flawed because Georgia has only found a few activities, none of which are analogous to emitting EtO, that are inherently dangerous to justify strict liability. *See Berger v. Plantation Pipeline Co.*, 173 S.E.2d 741, 743 (1970) (blasting); *Combustion Chemicals, Inc. v. Spires*, 433 S.E.2d 60, 62-63 (1993) (jury question whether mining reclamation activity of holding highly acidic water in ponds was inherently dangerous). This cause of action is limited to activities which, due to their inherently dangerous nature, make the defendant liable for damages flowing therefrom, despite the exercise of due care. *Combustion Chemicals,* 433 S.E.2d at 62-63. Moreover, under Georgia law, Plaintiffs must identify a statute that establishes strict liability because there is no common law strict liability claim. *See e.g., Daniel v. Am. Optical Corp.*, 304 S.E.2d 383, 385 (Ga. 1983) (determining that Georgia strict products liability evolved from statute, not common law); *Brooks v. Ready Mix Concrete Co.*, 96 S.E.2d 213, 214-15 (Ga. Ct. App. 1956) (imposing strict liability for blasting pursuant to statute governing trespass to realty).

Importantly, at least one Georgia court has already held that emission of EtO is not an ultrahazardous activity subject to strict liability. *Kurt v. Sterigenics U.S., LLC et al.*, No. 20-A-3432-6, at *4-5 (Ga. St. Ct. July 15, 2021). In *Kurt*, the plaintiffs argued that release of EtO emissions was an ultrahazardous activity, but the court held that no statute provided plaintiffs with a right to proceed under strict liability for emission of EtO. *Id.* Only on "rare occasions" have courts permitted ultrahazardous strict liability, and, in fact, courts routinely determine that

activities, while dangerous in some instances, often do not rise to the level of "inherently dangerous." *Id.* at *5; s*ee e.g., Lowry v. Cochran*, 699 S.E.2d 325, 329-30 (Ga. Ct. App. 2010), overruled on other grounds by *Dep't of Labor v. McConnell*, 828 S.E.2d 352 (Ga. 2019) (skydiving is not an inherently dangerous activity); *Luther v. Wayne Firer Home Ctr. of Tifton, Inc*., 592 S.E.2d 470, 472 (Ga. Ct. App. 2003) (welding is not an inherently dangerous activity); *Jenkins v. Ga. Power Co.*, 849 F.2d 507, 509 (11th Cir. 1988) (electricity is not an inherently dangerous activity); *Gullock v. Spectrum Sci. and Software*, 146 F.Supp.2d 1364, 1374-75 (M.D. Ga. 2001) (operation of air-to-surface weapons range is not an inherently dangerous activity).

Georgia law limits the imposition of strict liability to activities that are unavoidably ultrahazardous according to statute, *e.g.*, blasting. *See Berger*, 173 S.E.2d at 742-43. Emitting EtO within government limits is not such an inherently dangerous activity as a matter of law. KPR complied with all government regulations on EtO emissions, including obtaining a permit based on government assessment of safe emissions, and therefore cannot be considered to have carried out an ultrahazardous activity.[16] Plaintiffs allege no statutory basis for their strict liability claim, and it should be dismissed accordingly.

## IV.    Conclusion

For the foregoing reasons, KPR respectfully requests that this action be dismissed, with all costs cast against Plaintiffs.

This 7th day of September, 2021.

/s/ *Barry A. Fleming*

---

[16] In *General Refractories Co. v. Rogers*, the Supreme Court of Georgia stated that "the piling of dirt on defendant's own property in carrying out a legitimate business activity" was "not abnormally dangerous when supervised under the authority of the law of this state." 239 S.E.2d 795, 798 (1977). In *Rogers*, the court was determining whether defendant acted with conscious indifference to justify an award of punitive damages. The court stated it would not impose this liability when a defendant takes all steps required by the supervising government authority. *Id.* at 799.

Barry A. Fleming
GA Bar Number 262945
bfleming@flemingnelson.com
FLEMING & NELSON, LLP
631 Ronald Reagan Drive
P.O. Box 2208
Evans, Georgia 30809

*Attorney for Defendant Kendall Patient Recovery U.S., LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MOTION TO DISMISS was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification by email of such filing to counsel of record.

This 7th day of September, 2021.

/s/ *Barry A. Fleming*
Barry A. Fleming
GA Bar Number 262945