# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

ALOPECIA ARMSTRONG,
SABRINA WATKINS, and SUSAN
KELLY,

*Plaintiffs,*

v.

KENDALL PATIENT RECOVERY
U.S., LLC, a Delaware limited
liability corporation,

*Defendant.*

Case No. 1:21-cv-00112-JRH-BKE

**PLAINTIFFS DEMAND TRIAL BY JURY**

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Alopecia Armstrong, Sabrina Watkins, and Susan Kelly bring this First Amended Complaint and Demand for Jury Trial against Defendant Kendall Patient Recovery, U.S., LLC ("KPR") for the harm it caused to Plaintiffs as a result of their exposure to toxic ethylene oxide on KPR's premises. Plaintiffs allege as follows upon personal knowledge as to their own acts and experiences, and, upon information and belief as to all other matters:

## INTRODUCTION

1.     KPR operates an industrial medical sterilization plant in Augusta, Georgia. As part of its sterilization process, KPR uses and emits harmful ethylene oxide ("EtO").

2.      EtO's carcinogenic and mutagenic properties have been well documented in studies since at least the mid-1980s, it has been recognized as a hazardous air pollutant since 1991, and it has been classified as a human carcinogen since 1994. Nevertheless, KPR disregarded EtO's harmful properties and exposed individuals on its premises to excessive levels of EtO for decades.

3.      Self-reported emission estimates from the KPR facility indicate high levels of EtO release. KPR has released as much as 110,000 pounds of EtO in a single year. While a portion of KPR's EtO is emitted through controlled and monitored points, the largest amount of these emission estimates are uncontrolled "fugitive emissions" that have been escaping, and continue to escape, the KPR facility.

4.      Early air modeling around the KPR facility shows EtO levels in excess of acceptable cancer risk as determined by the U.S. Environmental Protection Agency ("U.S. EPA") and in excess of acceptable ambient concentration levels set by the Georgia Environmental Protection Division ("GA EPD").

5.      Plaintiffs worked at KPR's Augusta plant at various times between 1989 and 2004, where they were exposed to dangerously high levels of EtO. As a result of their exposure, Plaintiffs contracted breast cancer and uterine tumors and suffered multiple miscarriages. At no time did KPR warn

Plaintiffs of the dangers of EtO or that they were being exposed to excessive levels of EtO on its premises.

## PARTIES

6.    Plaintiffs Alopecia Armstrong, Sabrina Watkins, and Susan Kelly are all natural persons and citizens of the state of Georgia.

7.    Defendant Kendall Patient Recovery U.S., LLC is a limited liability company whose sole member/owner is InnerDyne Holdings, Inc., a Delaware corporation with its principal place of business in Ohio. Defendant owns a parcel of land located at 1430 Marvin Griffin Road, Augusta, Georgia 30913 on which it operates a medical sterilization facility.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because (i) the parties are citizens of different states, (ii) and the amount in controversy exceeds $75,000.

9.    This Court has personal jurisdiction over Defendant because Plaintiffs' claims arise out of and relate to Defendant's activity in this state.

10.    Venue is proper because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

**I.    Brief Overview of the Ethylene Oxide Industry**

11.    EtO is a flammable gas at room temperature that is produced in large volumes for industrial uses.

12.    Commercial medical equipment sterilizers use the EtO sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, EtO is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the EtO is pumped out of the chamber, and any remaining EtO is allowed to slowly dissipate from the equipment. While EtO's gaseous form has industrial uses, like medical device sterilization, the average person does not use EtO for such uses.

13.    Since at least 1968, KPR has used and continues to use EtO in its industrial medical device sterilization process.

14.    Throughout the industrial processes, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e., smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

15.     As such, KPR has, for decades, exposed workers and others on its property to carcinogenic EtO without their knowledge, all while KPR knew, or should have known, that EtO is dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

## II.     Health Effects of Ethylene Oxide Exposure

16.     EtO is an odorless, colorless gas that is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been known for decades.

17.     In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to EtO may increase the frequency of genetic mutations in humans. The NIOSH report also raised concerns about the potential carcinogenicity of EtO.

18.     In 1981, the NIOSH released a subsequent report that recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards, including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with increases of EtO concentrations, in addition to other adverse

5

effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increased incidence of leukemia and other cancers.

19.     The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of EtO and the petrochemical industry at large. Despite this widespread dissemination of the 1981 NIOSH report to users and emitters of EtO, KPR never informed Plaintiffs of the dangers of EtO exposure.

20.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

21.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of EtO. The study analyzed over 18,000 employees working with EtO at fourteen different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

22.     As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's

highest risk classification, finding EtO to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the U.S. EPA's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by thirty (30) times.

23.     Exposure to EtO has been widely studied and its negative health effects well documented. Presently, there is evidence linking EtO exposure to an increased risk of lymphohematopoietic cancers, such as non-Hodgkin's lymphoma, myeloma, and lymphocytic leukemia; breast cancer; tumors in the lungs, the uterus, and the brain; and reproductive and developmental impairments, including an increased rate of miscarriages and infertility.

24.     Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding a sterilization facility in Willowbrook, Illinois, operated by Sterigenics, which has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirm the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;

- Pediatric lymphoma;

- Breast cancer;

- Prostate cancer;

- Pancreatic cancer;

- Ovarian cancer; and

- Bladder cancer.

## III.   KPR Knew That EtO Was Harmful

25.    By the early 1980s, information regarding EtO's negative health effects had been widely disseminated to industrial users and emitters of the chemical. This means that, during the time Plaintiffs worked at KPR's Augusta plant, KPR knew or should have known that EtO was dangerous to human health and that its use posed a serious risk to individuals on its premises.

26.    In October 1985 the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's cacogenic health effects. In this Notice, the U.S. EPA also stated that it performed a dispersion model to estimate the concentration levels to which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional forty-seven (47) cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least several hours, a sufficient length of time for a significant human exposure to

occur." Ultimately, EtO was included on the original list of hazardous air pollutants identified in the 1990 Amendment to the Clean Air Act.

27.     By 1990, EtO users and emitters were aware of the dangers of the chemical and legal consequences of its use and emission. Indeed, in 1990 California Attorney General Van de Kamp brought a lawsuit against four emitters of EtO alleging that the EtO emitters had exposed an estimated 3 million people living near emissions sites to the potent carcinogen.

28.     Thus, the dangers EtO posed to individuals on KPR's premises were known, or should have been known, to KPR when Plaintiffs worked there.

29.     Despite this knowledge, KPR never informed Plaintiffs of the dangers of EtO.

## IV.     KPR Exposed Plaintiffs to Harmful Levels of Ethylene Oxide

30.     The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals that pose a threat to human health and the environment.

31.     A review of TRI data from the U.S. EPA shows EtO emissions from the KPR facility in Augusta over the course of thirty years, with data beginning approximately twenty (20) years after the facility's opening. *See* Figures 1 and 2.



(**Figure 1**, showing emissions from KPR between 1998 and 2018**)**

| Year | Fugitive Emissions (in lbs.) | Stack Emissions (in lbs.) |
|------|------------------------------|---------------------------|
| 1988 | 0 | 54,990 |
| 1989 | 3,697 | 106,827 |
| 1990 | 21,000 | 83,000 |
| 1991 | 40,000 | 12,000 |
| 1992 | 32,000 | 13,000 |
| 1993 | 32,500 | 13,000 |
| 1994 | 28,845 | 13,966 |
| 1995 | 27,310 | 13,781 |
| 1996 | 16,100 | 14,800 |
| 1997 | 16,078 | 12,661 |
| 1998 | 14,334 | 11,188 |
| 1999 | 12,044 | 300 |
| 2000 | 11,320 | 292 |
| 2001 | 11,914 | 553 |
| 2002 | 7,977 | 542 |
| 2003 | 8,336 | 682 |
| 2004 | 8,348 | 664 |
| 2005 | 6,926 | 602 |
| 2006 | 6,065 | 580 |
| 2007 | 5,812 | 558 |
| 2008 | 5,534 | 493 |
| 2009 | 3,965 | 207 |
| 2010 | 2,929 | 200 |
| 2011 | 1,237 | 179 |
| 2012 | 1,264 | 182 |
| 2013 | 1,089 | 144 |

| 2014 | 250 | 72 |
| 2015 | 250 | 79 |
| 2016 | 250 | 73 |
| 2017 | 145 | 139 |
| 2018 | 137 | 122 |

**(Figure 2)**

32.     KPR's historic emissions are gargantuan. For example, KPR

emitted more than 41,000 pounds of EtO in 1995; 104,000 pounds in 1990;

and over 110,000 pounds in 1989. A significant portion of KPR's emissions

include fugitive emissions from sources such as leaking valves and other

equipment.

33.     The GA EPD has calculated that the acceptable ambient

concentration ("AAC") for EtO is 0.00033 μg/m³. During the times Plaintiffs

worked at KPR, ambient EtO concentrations in the census tract containing

KPR's Augusta facility greatly exceeded this number. For example, based on

emissions data reported by KPR, the U.S. EPA-modeled ambient

concentration of EtO in that census tract was more than 35 times greater

than the AAC in 1999, and more than 100 times greater than the AAC in

1996 and 2002.

34.     On November 19, 2019, the GA EPD publicly released a memo

reporting on air dispersion modeling of EtO emissions from KPR's Augusta

plant. The GA EPD's modeling revealed a maximum ground level

concentration—the concentration of a pollutant to which a human is normally

exposed—well in excess of the AAC for EtO. Specifically, the GA EPD found that the highest annual concentration of EtO around the facility was 0.0618 $\mu g/m^3$, which is over 187 times the AAC.

35.     Prior to the GA EPD's November 2019 release of air modeling results, federal and state air quality reports were intended only for government and industry audiences and were not widely circulated to the media or the general public. At no time did KPR warn Plaintiffs that they were being exposed to dangerously high levels of EtO on its premises.

## FACTS SPECIFIC TO PLAINTIFF ARMSTRONG

36.     Plaintiff Alopecia Armstrong worked at the KPR facility between approximately 1990 and 1997.

37.     Ms. Armstrong consistently inhaled air with dangerous levels of EtO on Defendant's property in and around Defendant's facility.

38.     As a result of her exposure to EtO, Ms. Armstrong was diagnosed with breast cancer in 2007.

39.     At the time of her diagnosis, Ms. Armstrong did not know that her medical condition was wrongfully caused or that it was caused by her exposure to EtO. At no time did Defendant warn Ms. Armstrong that she was being exposed to excessive levels of EtO on its premises or of the dangers of EtO.

12

40.     Ms. Armstrong first learned of the dangers of EtO sometime after July 19, 2019, when a friend informed her of a news article discussing EtO and elevated cancer risks in Georgia. The article, published by WebMD and Georgia Health News on July 19, 2019, was entitled "Residents Unaware of Cancer-Causing Toxin in Air." The article focused on EtO emissions and elevated cancer risks in Covington and Smyrna; it did not discuss emissions from the KPR facility or any other source in Augusta. Indeed, the article seemed to suggest that the only places in Georgia with excessive EtO emissions and elevated cancer risks were Covington and Smyrna. The article also noted that neither federal nor state regulators had issued any sort of press release about EtO emissions and elevated cancer risks in Georgia.

41.     After learning of the WebMD/Georgia Health News article, Ms. Armstrong began investigating whether her cancer could have been caused by EtO. She did not discover that she had been exposed to excessive levels of EtO or that Defendant's EtO emissions were the cause of her cancer until approximately November of 2019.

42.     Prior to the July 2019 WebMD/Georgia Health News article, Ms. Armstrong had no reason to know or suspect that EtO was dangerous or that she had been exposed to excessive levels of EtO at KPR. Reasonable diligence could not have uncovered the cause of her injuries prior to that time.

13

## FACTS SPECIFIC TO PLAINTIFF WATKINS

43.     Plaintiff Sabrina Watkins worked at the KPR facility between approximately 2002 and 2004.

44.     Ms. Watkins consistently inhaled air with dangerous levels of EtO on Defendant's property in and around Defendant's facility.

45.     As a result of her exposure to EtO, Ms. Watkins had multiple miscarriages during and after the time she worked at KPR.

46.     At the time of her miscarriages, Ms. Watkins did not know that they were wrongfully caused or that they were caused by her exposure to EtO. At no time did Defendant warn Ms. Watkins that she was being exposed to excessive levels of EtO on its premises or of the dangers of EtO.

47.     Ms. Watkins first learned of the dangers of EtO sometime after July 19, 2019, when her mother informed her of a news article discussing EtO and elevated cancer risks in Georgia. The article, published by WebMD and Georgia Health News on July 19, 2019, was entitled "Residents Unaware of Cancer-Causing Toxin in Air." The article focused on EtO emissions and elevated cancer risks in Covington and Smyrna; it did not discuss emissions from the KPR facility or any other source in Augusta. Indeed, the article seemed to suggest that the only places in Georgia with excessive EtO emissions and elevated cancer risks were Covington and Smyrna. The article

14

also noted that neither federal nor state regulators had issued any sort of press release about EtO emissions and elevated cancer risks in Georgia.

48.    After learning of the WebMD/Georgia Health News article, Ms. Watkins began investigating whether her miscarriages could have been caused by EtO. She did not discover that she had been exposed to excessive levels of EtO or that Defendant's EtO emissions were the cause of her miscarriages until approximately November of 2019.

49.    Prior to the July 2019 WebMD/Georgia Health News article, Ms. Watkins had no reason to know or suspect that EtO was dangerous or that she had been exposed to excessive levels of EtO at KPR. Reasonable diligence could not have uncovered the cause of her injuries prior to that time.

## FACTS SPECIFIC TO SUSAN KELLY

50.    Plaintiff Susan Kelly worked at the KPR facility between approximately 1989 and 2003.

51.    Ms. Kelly inhaled air with dangerous levels of EtO on Defendant's property in and around Defendant's facility.

52.    As a result of her exposure to EtO, Ms. Kelly had a lump removed from her right breast in 1997, was diagnosed with colon cancer in 2016, was diagnosed with a uterine tumor in 2020, and had two miscarriages.

53.    At the time of these injuries, Ms. Kelly did not know that they were wrongfully caused or that they were caused by her exposure to EtO. At

no time did Defendant warn Ms. Kelly that she was being exposed to excessive levels of EtO on its premises or of the dangers of EtO.

54.     Ms. Kelly first learned of the dangers of EtO sometime after July 19, 2019, when she read a news article discussing EtO and elevated cancer risks in Georgia. The article, published by WebMD and Georgia Health News on July 19, 2019, was entitled "Residents Unaware of Cancer-Causing Toxin in Air." The article focused on EtO emissions and elevated cancer risks in Covington and Smyrna; it did not discuss emissions from the KPR facility or any other source in Augusta. Indeed, the article seemed to suggest that the only places in Georgia with excessive EtO emissions and elevated cancer risks were Covington and Smyrna. The article also noted that neither federal nor state regulators had issued any sort of press release about EtO emissions and elevated cancer risks in Georgia.

55.     After learning of the WebMD/Georgia Health News article, Ms. Kelly began investigating whether her medical issues could have been caused by EtO. She did not discover that she had been exposed to excessive levels of EtO or that Defendant's EtO emissions were the cause of her medical issues until approximately August of 2019.

56.     Prior to the July 2019 WebMD/Georgia Health News article, Ms. Kelly had no reason to know or suspect that EtO was dangerous or that she

had been exposed to excessive levels of EtO at KPR. Reasonable diligence could not have uncovered the cause of her injuries prior to that time.

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and Against Defendant KPR)

57.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

58.     At all times relevant, Defendant owed a duty to exercise ordinary care in keeping its premises safe for those who—like Plaintiffs—lawfully came onto Defendant's property at its express or implied invitation. Specifically, Defendant had a duty to Plaintiffs to keep its premises safe from or warn of hidden dangers such as high levels of EtO in or around its facility.

59.     Defendant's use and emission of EtO on its premises exposed invitees like Plaintiffs to dangerously high levels of EtO. At the time Plaintiffs worked on Defendant's premises, Defendant knew that EtO was dangerous to humans and that Plaintiffs were being exposed to excessive levels of EtO. Nevertheless, Defendant failed to keep Plaintiffs' exposure to EtO at safe levels or to warn them of the dangers of EtO and their excessive exposure to it.

60.     Defendant's failure to keep its premises safe for Plaintiffs and/or to warn them of the danger was a breach of its duty.

61.     As a proximate result of that breach, Plaintiffs suffered injuries of a personal and pecuniary nature.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs requests that the Court enter judgment in their favor and against Defendant as follows:

a.     An award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

b.     An award of punitive damages as allowed by law and in an amount to be determined;

c.     An award of attorneys' fees and costs and litigation expenses;

d.     An award of prejudgment interest on all amounts awarded;

e.     An Order for injunctive and declaratory relief; and

f.     Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

**ALOPECIA ARMSTRONG,
SABRINA WATKINS, and
SUSAN KELLY**

By: _/s/ Benjamin H. Richman_
*One of Plaintiffs' Attorneys*

18

Charles C. Bailey
charlie.bailey@cookconnelly.com
Sutton Connelly
sutton.connelly@cookconnelly.com
**COOK & CONNELLY, LLC**
750 Piedmont Ave. NE
Atlanta, GA 30308
Tel: 678.539.0680

Benjamin H. Richman*
brichman@edelson.com
Michael Ovca*
movca@edelson.com
**EDELSON PC**
350 North LaSalle, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370

*admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of October, 2022, a copy of the

foregoing **First Amended Complaint and Demand for Jury Trial** was

filed with the Clerk of Court via its CM/ECF service, which will send notification of

such filing to all counsel of record.

<u>/s/ Benjamin H. Richman</u>